**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.  11-CR-20100-SEITZ**

**UNITED STATES OF AMERICA**

**v.**

**MARK WILLNER, MD,**

                **Defendant.**

_____/

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States hereby submits this Memorandum in Aid of Sentencing regarding defendant Mark Willner, MD.  Defendant Willner, a medical doctor with decades of psychiatric experience, assisted the owners and operators of American Therapeutic Corporation (ATC) in committing one of the largest and most brazen health care fraud conspiracies in recent memory. The defendant has been found guilty by a federal jury of conspiracy to commit health care fraud for his part in the ATC conspiracy.  There is no dispute that ATC billed Medicare for more than $205 million in fraudulent claims.  This massive fraud was committed by manipulating the proper treatment of Alzheimer's and dementia patients, substance abusers seeking treatment, and others convinced or cajoled into spending time at ATC.  Without Willner and other doctors signing thousands of false and fraudulent patient documents – documents that stated he was personally directing the patients' treatment plans and having "Face to Face" contact with the patients – ATC could not have succeeded on such an immense scale.

The United States agrees with the recommendations of the United States Probation Office (Probation) and respectfully requests that the Court (1) calculate Defendant Willner's Total Offense Level at 40 which falls into a Guidelines range of 292-365 months; (2) impose a

1

sentence of 120 months (10 years), the statutory maximum for Defendant Willner's conviction; (3) impose a three year term of supervised release; and (4) require Defendant Willner to pay restitution of $51,965,071.24 jointly and severally with his co-conspirators in the instant case and in the case *United States v. Duran et al.*, 10-20767.

## FACTUAL SUMMARY

As the Court learned during the seven-week trial in this case, ATC committed a massive, $205 million fraud against the Medicare program. The vast majority of the $205 million billed to Medicare consisted of claims for partial hospitalization program (PHP) services; a small portion was billed for unnecessary sleep studies performed by the American Sleep Institute (ASI). The defendant was one of three doctors convicted of participating in the ATC fraud. The patients at ATC were procured through a vast kickback operation. They were then admitted to ATC under the "care" of the defendant or other co-conspirator doctors, purportedly to receive PHP treatment. The vast majority of patients for whom ATC submitted claims to Medicare for PHP treatment did not need the treatment, and even those who might have needed it, did not get appropriate PHP treatment.

PHP treatment is a highly specialized treatment for severely mentally ill individuals who are in acute phases of their diseases. As the name suggests, a partial hospitalization program is designed to treat patients whose mental state does not permit them to function in an out-patient setting, and who would otherwise need to be hospitalized if they were not at the PHP.

The patients who attended ATC as a result of the kickbacks, while not qualified for PHP services, were some of the most vulnerable members of our society. They were overwhelmingly either elderly residents of assisted living facilities who had dementia or Alzheimer's disease, or

substance abusers who were too desperate for treatment to refuse when their corrupt halfway house owners required that they attend ATC.

The treatments that ATC provided were also not appropriate for a true PHP program, even if the patients had been severely mentally ill in acute phases of their diseases.  The treatments were not individualized to the patient and were not designed and monitored by doctors and therapists to cause improvement in the patient's condition.  As multiple witnesses testified at trial, doctors at ATC did not treat patients, but instead merely signed forms indicating they had; the length of a patient's stay was dictated by management, not by the doctors, based on how long Medicare would pay, not on the patients' needs; and patients were cycled through ATC, sometimes ten or more times, to maximize profit regardless of the patients' conditions.  To cover up the true nature of ATC, doctors and therapists fabricated medical records to make it appear that the patients needed, and received, PHP treatment.  Even those who did not create false documents themselves signed them, knowing they were false. Doctors, including the defendant, signed thousands of files stating that the patient's treatment plan had been created by the "physician (myself)" and stating that the doctor had "Face to Face Contact" with the patient, sometimes even at a specific time of day.

Because the treatments were not real PHP treatments, even those small percentage of patients who might have qualified for PHP treatment, were victims of fraud.  These victims were perhaps even more tragic than those who did not qualify, because they truly needed PHP treatment and the defendant and his co-conspirators could not be bothered to treat them, just to bill as though they had.

## GUIDELINE CALCULATIONS

The United States Probation Office recommends that the Total United States Sentencing Guidelines (USSG or Guidelines) Offense Level for Willner is 40.  The United States concurs with all of the calculations of the United States Probation Office. The United States's and the USSG's calculation of the Total Offense Levels are as follows:

(1)     Base Offense Level, § 2B1.1(a)(2):                                                     6

(2)     Loss (Greater than $100 million but less than $200 million), §2B1.1(b)(1)(N):   26

(3)     Sophisticated Means, §2B1.1(b)(9)(C):                                         2

(4)     Vulnerable Victims, §3A1.1(b)(1) and (2):                                     4

(5)     Use of Special Skill/Abuse of Position of Trust, §3B1.3:                       2

TOTAL OFFENSE LEVEL:                                                               40

Sentencing Guideline Range:                                            292-365 months

The basis for these calculations is set forth below.

**(A) Amount of intended loss**

The intended loss in this case is appropriately determined by the amount the defendant and his co-conspirators billed to the Medicare program from the time he joined the conspiracy until the end of the conspiracy, $132,768,125.  The Probation Office recommends that the correct loss range for Defendant Willner is greater than $100 million but less than $200 million.  The United States agrees with the recommendation of the Probation Office.  Defendant objects.

1.   <u>The Intended Loss Is The Amount Billed To Medicare</u>

The proper loss amount for purposes of calculating the loss enhancement is "the <u>greater</u> of actual loss or intended loss." U.S.S.G. § 2B1.1, comment (n.3(A)) (emphasis added).

Under the Patient Protection and Affordable Care Act ("PPACA"), the aggregate dollar amount of fraudulent bills submitted to a government healthcare program is *prima facie* evidence of the amount of the "intended loss." PL 111-148, 2010 H.R. 3590 §10606(a)(2)(B).  This statutory requirement has since been incorporated into the Sentencing Guidelines Manual in the November 1, 2011 edition.  *See* U.S.S.G. §2B1.1, Nov. 1, 2011, comment (n.3(F)(viii)) ("In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted.").

The Eleventh Circuit has affirmed intended loss calculations based on the full amount billed to Medicare, even after finding that the doctor knew or reasonably should have known she would only receive 80% of what she billed to Medicare.  *United States v. Hoffman-Vaile*, 568 F.3d 1335 (11th Cir. 2009).

The Fourth Circuit explained well in *Miller* the reason that intended loss should rest in the amount billed to Medicare: "As anyone who has received a bill well knows, the presumptive purpose of a bill is to notify the recipient of the amount to be paid.  Indeed, courts have recognized this principle for well over a hundred years." *United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003) (citations omitted).  Courts, including the Eleventh Circuit, have similarly rejected a requirement that the intended loss in a fraud case be "economically realistic."  *See, e.g.*, *United States v. Wai-Keung*, 115 F.3d 874, 877 (11th Cir. 1997) ("It is not required that an intended loss be realistically possible."); *Miller*, 316 F.3d at 501-02 ("[T]he majority of circuits in more recent cases, however, have rejected this 'economic reality' approach, holding that the

5

Guidelines permit courts to find intended loss in an amount exceeding that which was in fact possible or probable.") (collecting cases).  Nor is a defendant's subjective "expectation" the correct gauge of intended loss.  "[E]xpectation is not synonymous with intent when a criminal does not know what he may expect to obtain, but intends to take what he can." *United States v. Geevers*, 226 F.3d 186, 193 (3d Cir. 2000).

Just as in *Geevers* and *Miller*, while the co-conspirators here "may not have expected to get it all, [they] could be presumed to have wanted to." *Id*; *Miller* 316 F.3d at 504.  Here, there is no evidence that defeats the *prima facie* evidence of the amount of the bills these co-conspirators submitted to Medicare.  The co-conspirators carefully constructed their fraud to increase their chances of Medicare paying the claim.  For instance, they altered patient files to contain the appropriate wording that Medicare would want to see if a claim was challenged.  They engaged doctors, like Dr. Willner, to sign patient files for obviously unqualified patients, certifying that these patients required rigorous PHP care.  These co-conspirators wanted to get every cent they could get out of Medicare, and if Medicare would have paid them the full $205 million, they certainly would have accepted it.  *See, e.g.*, Duran Sentencing Cross Examination, Tr. Sept. 14, 2011, at 65 (attached as Exhibit A) ("Q. Mr. Duran, you wanted to get as much money out of Medicare that you could possibly get, right? A. Yes. Q. If they sent you the $205 million, you wouldn't have sent it back, right? A. Probably not.")

Defendant cites to *United States v. Webb*, 386 Fed. App'x 914 (11th Cir. 2010), as support for his argument that using "the amount billed to Medicare, as opposed to the amount reimbursed by Medicare, might have constituted erroneous speculation." *See* DE 1129, Def. Objs. at 5.  Defendant incorrectly summarizes the holding of that case.  That case discussed the reimbursable amount, not the reimbursed amount.  The reimbursable amount is typically roughly

80% of the billed amount, not the amount actually paid by Medicare to a facility. Moreover, the Court was careful in that case to explain that the defendant had presented evidence purportedly showing reliance on the reimbursable amount, in an effort to rebut the presumption of using the full billed amount. It was because of that presentation of evidence that the Court had concerns that the district court had not fully taken into account the evidence.

Here, the defendant has not offered any evidence to rebut the prima facie presumption. Indeed, he could not do so even if he tried. Both Valera and Duran, his co-conspirators, have already testified that they tried to get every penny out of their fraud, including the 20% that Medicare leaves to co-pays. *See* Duran Sentencing Cross-Examination Tr. at 72 ("Q. …You intended to get the co-pays if you could get them, didn't you? A. Yes.") (Attached as Ex. A); Valera Sentencing Direct Examination Tr., Sept. 19, 2011, at 13-14 ("Q. In addition to collecting 80 percent of the published rates, what was your intention with respect to collecting co-payments that may be available through the Medicare program? A. . . . we tried to collect co-payments, but we know also by history, I mean, that Medicaid no longer pays for co-payments, but we made an effort, I mean, to collect them…. Q. But your intent was to attempt to collect the co-payments that might be available, depending on the submission to Medicare. A. Yes, uh-huh.") (Attached as Ex. B).

Congress, the Courts, and the Sentencing Commission have recognized the full amount billed to Medicare as the *prima facie* evidence of intended loss in a Medicare fraud case, despite Congress's, the Courts' and the Sentencing Commission's full knowledge of Medicare's payment schedules and percentages of payments. These entities, the Circuit Courts, and this Court have repeatedly recognized that Medicare fraudsters should be responsible for the amount

they billed to Medicare.[1] Willner has offered no evidence to rebut the presumption here. The full amount billed to Medicare during the time period Willner was involved in the conspiracy is the correct calculation of intended loss.

   2. Willner is Responsible for the Reasonably Foreseeable Loss Attributable to His Co-Conspirators

Willner contends that he should only be responsible for the billing by ATC that used his Medicare number as attending physician and only at the Fort Lauderdale and Boca Raton facilities. Willner is wrong. He is responsible for the reasonably foreseeable acts of his co-conspirators, not simply his own acts. He is therefore responsible for all of the Medicare billing submitted by ATC and ASI from the time he joined the conspiracy.

"A 'district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy.'" *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir.2010), cert. denied, 131 S.Ct. 1540 (2011) (*quoting United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir.2003)); *see also* U.S.S.G. § 1B1.3(a)(1)(B) (providing that, in the case of jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of the criminal activity can count toward offense characteristics). The district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant. *See Mateos*, 623 F.3d at 1370. Once the court determines the scope of the defendant's involvement in the conspiracy, it then may consider "all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity." *United States v. McCrimmon*, 362 F.3d 725, 731 (11th Cir.2004) (citation omitted).

---

[1]      In *United States v. Duran, et al.*, 10-20767-CR-KING, Judge King sentenced co-conspirators Duran, Valera, and Negron based on 100% of the amount billed to Medicare.

Here, the scope of this defendant's criminal activity was quite broad. Even by his own calculations, which greatly minimize his actual involvement, he is responsible for more than $24 million in billed services. [DE 1129, Def. Objs., at 3] Taking the amount billed using Willner's Medicare number at all facilities, including ASI, he is personally responsible for more than $70 million in billing. Having determined Willner's personal involvement, the Court may thus hold him responsible for all reasonably foreseeable acts of his co-conspirators. It was plainly reasonably foreseeable to Willner that ATC would be billing Medicare for PHP services at all of its facilities, just as it was doing at the facilities where he says he was present.

Willner states that ATC was using his Medicare number as attending physician at the Miami and Homestead facilities "unbeknownst to Dr. Willner." [DE 1129, Def. Objs., at 3] First, it is of no moment whether or not Willner knew they were using his Medicare number. It was still reasonably foreseeable that they were billing Medicare for PHP services. Second, Dr. Willner did not testify. There is no evidence that he did not know ATC was using his Medicare number as attending physician. His brief refers to his wife's testimony, but she obviously could not have testified to his state of mind. Willner also states he should not be held responsible for the ASI billings. Again, the "evidence" he cites is nowhere in the record. [*See* DE 1129 at 4] What is in the record is Mathis Moore's testimony that Willner signed dozens of sleep study prescriptions over lunch with Moore, without any patients present, and without any patient files.

The amount ATC and ASI billed to Medicare at all facilities during the time period of Willner's involvement in the conspiracy was $132,768,125. This is the appropriate figure for intended loss.

9

**(B) Sophisticated means**

A two-level enhancement for offenses involving "sophisticated means" is appropriate in this case. The Probation Office recommends that, pursuant to the USSG, the "sophisticated means" enhancement should apply. The defendant does not dispute the application of this enhancement.

The ATC scheme spanned eight years, seven facilities, involved hundreds of employees, assisted living facility owners, halfway house owners, patient brokers, and money launderers, generated and paid out hundreds of thousands of dollars in kickbacks monthly, and evaded detection for years. The defendant and his co-conspirators engaged in extensive efforts to conceal their crimes. Defendant signed thousands of patient files for patients he had not treated, indicated that he had "Face to Face Contact" with the patients and certifying that the patients were treated under a plan devised by "the physician (myself)" knowing those statements to be false. Evidence at trial also included the testimony of patient broker Mathis Moore, who testified that Willner signed dozens of sleep study prescriptions over lunch with Moore so that the patients in the sleep study would have valid-looking prescriptions in their files.

Sophisticated means is a scheme-based enhancement. *See United States v. Ghertler*, 605 F.3d 1256, 1267-68 (11th Cir. 2010); *United States v. Baird*, 348 Fed.Appx. 442, 2009 WL 3115716 (11th Cir. 2009). This Court has applied the sophisticated means enhancement in every sentencing of a fraud defendant in this case so far. Judge King applied the sophisticated means enhancement to all defendants in the companion case, *United States v. Duran, et al.*, 10-20767-CR-KING. This enhancement plainly applies here.

10

**(C) Vulnerable Victims**

The Probation Office recommends that a four-level adjustment should apply because Willner "knew or should have known that a victim of the offense was a vulnerable victim" (two-level adjustment) and "the offense involved a large number of vulnerable victims" (additional two-level adjustment).  USSG §3A1.1(b)(1) and(2).  The United States agrees with the Probation Office.  The Vulnerable Victims enhancement applies here and has already been applied to Willner's co-conspirators in *United States v. Duran et al.*, 11-20767-CR-KING.

According to the Application Notes to Section 3A1.1(b) a "vulnerable victim" means a person who is a victim of any conduct for which the defendant is accountable under the Guidelines and who is "unusually vulnerable due to age, physical or mental condition. . . ." USSG §3A1.1, Application Note 2.

The Eleventh Circuit affirmed the application of this enhancement in a Racketeer Influenced and Corrupt Organizations Act (RICO) case charged in connection with a Medicaid fraud scheme where the scheme involved recycled blood derivatives that ultimately ended up going to AIDS and hemophilia patients.  *See United States v. Bradley*, 644 F.3d 1213 (2011). The Eleventh Circuit rejected the argument that the vulnerable patients were not "victims" in that case because they did not suffer bodily injury, *id.* at 1288, and made clear that the enhancement applies even when the vulnerable patients did not suffer financial losses related to the fraud.  *Id.* at n. 128 ("Nor is there the requirement, as with § 2B1.1(b)(2), . . . that a victim suffer part of the financial loss counted towards the total attributed to the defendant's fraud."); *see also United States v. Echevarria*, 33 F.3d 175, 180-81 (2nd Cir. 1994) ("[E]ven though there is a scam, ... the economic impact of which is on the government, an enhancement for vulnerable victims is appropriate where the exploitation of patients is part of the scam.") (citations and quotations

11

omitted) (*superseded on other grounds*); *United States v. Bachynsky*, 949 F.2d 722, 735 (5th Cir. 1991) ("We do not find that the only victims of Dr. Bachynsky's scheme were the deep pockets that paid the phony claims, or that his patients were in no way victims of the fraud.").

The vulnerable victims here were ATC's and ASI's patients. These elderly, sick, demented, and substance abusing people were props that the ATC co-conspirators used to show Medicare they had real patients. These patients were at ATC because they had valid Medicare numbers and because an assisted living facility owner or halfway house owner sold their presence to the co-conspirators.

ATC patient Vera Mitchell was a patient who plainly had Alzheimer's disease. Even Mitchell's patient file, which was subject to the ATC file-scrubbing process, was rife with indications that she was suffering from dementia, such as multiple statements that she was a "poor historian" and did not remember details about her family. *See* GX 57. Further, Mitchell's medical doctor, Dr. Taubman, testified that he was sure she had advanced dementia or Alzheimer's disease. Dr. Willner was supposedly Ms. Mitchell's psychiatrist, and he signed her patient file repeatedly.

Ms. Mitchell was by no means the only impaired patient at ATC. Therapists and other patients, including those who testified at trial, reported noticing patients who were so demented they could not participate in group therapy, and at times would urinate or defecate on themselves during the group therapy sessions. The patient files at ATC contained numerous examples of patients who were taking Alzheimer's medications, not to mention those files that had been scrubbed of any reference to Alzheimer's or dementia.

Regarding the substance abuse patients, Keith Humes testified that halfway house owners like him would require their patients to attend ATC, even though those patients, who needed

substance abuse treatment, did not get substance abuse treatment at ATC. Substance abuse patients, like those Humes provided, would relapse after attending ATC because they had not received the treatment they needed. The Court heard from two such substance abusing patients, Mr. Riley Wynn and Mr. Wyatt Barnfield, who testified that attending ATC was a prerequisite of living at their halfway houses.

The patients at ATC facilities were not getting the treatment they needed for the diseases they actually had. And they were in no position to complain about it because they were too frail (Alzheimer's and dementia patients) or because they needed a place to live (halfway house patients). The *Bradley* court determined that the patients in that case "were victims because Bradley III caused their physicians to provide them with recycled blood-derivatives. And Bradley III's schemes targeted them, exploiting their need for medication so he could make a profit. The district court did not err in applying the § 3A1.1(b) Adjustment." *Id.* at 1289. Here, too, the patients were victims because ATC paid for these individuals to sit like props while the defendant and his co-conspirators knew that no legitimate treatments would be provided and that the patients' presence at ATC would prevent them from getting treatments they actually needed. The adjustments in Section 3A1.1(b) should apply.

**(D) Use of a Special Skill/Abuse of Position of Trust**

Pursuant to the Guidelines, Section 3B1.3, a two-level enhancement applies if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commitment or concealment of the offense." See USSG § 3B1.3. The Probation Office recommends that, pursuant to the USSG, because Defendant Willner "used a special skill in a manner that significantly facilitated the commission or concealment of the offense, the offense level is increased by two levels," the enhancement should apply to Willner's

13

Total Offense Level.  The defendant does not dispute Probation's application of this enhancement.  The United States concurs with the recommendation of the Probation Office that Section 3B1.3 applies, but notes that Dr. Willner both used a special skill and abused a position of trust.

Application Note 4 to Section 3B1.3 defines "special skill" and specifically identifies doctors as possessing a "skill not possessed by members of the general public and usually requiring substantial education, training or licensing."  USSG § 3B1.3, App. Note 4.

There is no dispute that Defendant Willner, during the entire course of his participation in the ATC conspiracy, was a licensed medical doctor.  There is also no question he used that special skill in his commission of the offense.  Willner was a Medical Director of four of ATC's facilities.  He signed thousands of patient files as the attending physician.  Without Willner and the other physician co-conspirators, ATC could not have committed this offense.

Willner also abused a position of public trust.  The Eleventh Circuit is one of many that have held that physicians hold a special position of trust with Medicare.  *See United States v. Liss*, 265 F.3d 1220, 1229-30 (11th Cir. 2001) (collecting cases).  In order for the enhancement to apply, the defendant must have "contributed in some significant way to facilitating the commission or concealment of the offense."  *United States v. Garrison*, 133 F.3d 831, 837 (11th Cir.1998) (internal marks and citations omitted).

Willner was the licensed psychiatrist who was identified to Medicare in ATC's billing as the attending physician for more than $70 million in bills.  Willner disputes that amount, arguing he is really only responsible for $24 million.  But he does not dispute he knew that ATC used his billing number to substantiate at least $24 million in patient bills.  And Willner cannot dispute that he knew Medicare's requirements and that he know that he had certified to Medicare that he

14

would not knowlingly cause to be submitted false claims. *See* GX 52 (Attached as Exhibit C).

Willner therefore cannot dispute that Medicare was relying on his certification that the patients

were qualified and the treatment was real PHP treatment for at least those $24 million in claims,

a significant amount by any measure. Willner also signed thousands of patient files attesting that

the patient was treated under a plan developed by "the physician (myself)" and that he had "Face

to Face Contact" with the patients. These hefty files were at the heart of ATC's efforts at

concealment. There is no question Willner abused a position of trust with Medicare. The

enhancement under Section 3B1.3 applies here for both of the reasons it could be applied.[2]

### SENTENCING FACTORS

Title 18, United States Code, Section 3553(a), enumerates several factors that the Court

shall consider in sentencing the defendant. These factors are discussed below numbered as they

are in Section 3553(a).

**(1) The nature and circumstances of the offense and the history and characteristics of the defendant.**

**(A) The Offense**

The circumstances of the offense are especially egregious here. This was not just

Medicare fraud, this was Medicare fraud on a scale that is huge even in South Florida. They

---

[2] Because Probation's calculation of Willner's Guidelines level already more than doubles the statutory maximum, the Government did not pursue an objection to add a leadership role for Dr. Willner. It should be noted, however, that if the Court applies the Section 3B1.3 enhancement on the basis of abuse of the public trust, rather than on the basis of special skill, the Court may also apply a 3-level enhancement under Section 3B1.1(b), because Willner was a manager or supervisor in a criminal activity that involved five or more participants. *See* USSG §3B1.1(b); *see also* USSG §3B1.3 (allowing application of §3B1.1 if the §3B1.3 enhancement is based on abuse of trust). Willner was the Medical Director of four of ATC's seven locations; he admits to being the on-site Medical Director at two of those locations; and he used as his defense at trial that he was supervising a fleet of at least nine ARNPs at various ATC facilities, along with Dr. Krithika Iyer, all of whom he was apparently paying out of his ATC stipend. Willner qualifies for a manager role enhancement.

stole $87 million from Medicare, and they tried to steal $205 million.  Worse yet, they did it all by buying patients from the patients' supposed caretakers and using the patients as mere props to sit in ATC's centers, appearing to receive PHP treatment.  And the defendant, a medical doctor with decades of experience, actively helped them give that appearance.  In reality, ATC's patients were demented, sick, or substance abusers hoping for a recovery program, and none of the treatments these patients actually needed were provided by ATC.  These co-conspirators, including Dr. Willner, victimized the most vulnerable members of our society so that they could have nicer homes and fancy artwork.

**(B)    The history and characteristics of the defendant**

The defendant is a medical doctor with decades of experience.  He and his fellow physician co-conspirators gave ATC the imprimatur of legitimacy that allowed the fraud to continue for as long as it did without detection.

> **(2) The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training.**

Willner's punishment should take into account not only the seriousness of his criminal conduct, which is described above, but also the need to deter future criminals from stealing from the Medicare program.  South Florida remains ground zero for Medicare fraud, and the schemes are becoming more sophisticated, like the ATC scheme was.  *See e.g.*, *United States v. Macli, et al.*, 11-20587-CR-SCOLA ($55 million PHP scheme).  Moreover, after uncovering the ATC scheme, the United States is now combating other PHP schemes all over South Florida as well as in Houston, Baton Rouge, and elsewhere.  *See, e.g.*, *United States v. Sanjar et al.*, 4:11-cr-861 (S.D. Tex.) ($97 million PHP scheme); *United States v. Khan*, 4:12-cr-64 (S.D. Tex.) ($116

16

million PHP scheme); *United States v. Jafri et al*, 12-cr-00073-BAJ-SCR (M.D. La.) ($225 million PHP scheme). Taxpayers have poured billions and billions of dollars into fraud enterprises. Doctors who signed off on the fraudulent files and lent their Medicare numbers to the fraudulent billing submissions could have stopped these frauds by refusing to participate. ATC's elaborate scheme was designed to avoid detection – and it did so successfully for eight years – but it was dependent on complicit medical professionals. While this Court has no-doubt seen one-million-dollar schemes committed without the aid of a doctor, hundred-million-dollar schemes do not happen without the complicity of medical professionals like Dr. Willner.

The seriousness with which Congress views Medicare fraud cannot be overstated. In 2010, Congress directed the Sentencing Commission to add a specific offense enhancement for "a Federal health care offense relating to a Government health care program" that involves $1 million or more. PPACA, PL. No. 111-148, § 10606(a)(2)(C), 124 Stat. 119, 1006-07 (March 23, 2010). Under that enhancement, if the loss amount is between $1 million and $7 million, 2 levels are added; if it is between $7 million and $20 million, 3 levels are added; and if it is $20 million or more, 4 levels are added. *Id.* Congress also directed the Sentencing Commission to review the Guidelines and policy statements for health care fraud offenses to ensure that they "reflect the serious harms associated with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud" and to provide "increased penalties for persons convicted of health care fraud offenses in appropriate circumstances." *Id*. § 10606(a)(3)(A). The Sentencing Guidelines now reflect the changes provided for in the 2010 law. *See* USSG §2B1.1(b)(8), Nov. 1, 2011.

If the co-conspirators had been able to conceal their fraud one year longer, the defendant would receive a 4-level enhancement simply because he had helped perpetrate a Medicare fraud

17

of more than $20 million.  *See id.*  The amount of intended loss here is more than $132 million –

more than six times that threshold.  The statutory maximum 10-year sentence is eminently

reasonable in light of the seriousness of this massive fraud on the Medicare program.  *See United*

*States v. Mateos*, 623 F.3d 1350, 1368 (11th Cir 2010) (considering the effect the new

enhancements would have had, as a part of holding a 30-year sentence for a doctor to be

reasonable).

### (3)  The kinds of sentences available

Convictions of conspiracy to commit health care fraud carry a maximum statutory term

of ten years imprisonment per count.  *See* 18 U.S.C. §§ 1349.

### (4)  The sentencing range established by the USSG

The United States maintains that the Total Offense Level should be a 40.  The United

States's position on the Guidelines calculation is set forth in the Guideline Calculation section,

*supra*.  Because a Level 40 corresponds with a range that is higher than the statutory maximum,

the United States maintains that Defendant Willner should be sentenced to the statutory

maximum 120 months.

### (5) Any pertinent policy statement issued by the USSG

The United States is unaware of any pertinent policy statements issued by the USSG.

### (6) The need to avoid unwarranted sentencing disparities among defendants with similar records

The requested sentence is reasonable in comparison to the defendant's co-conspirators

and in comparison to the sentences of other doctors in this District.

In this case, the chief mastermind, Larry Duran, received a 50-year sentence from Judge

King in a related case.  *See United States v. Duran et al.*, 10-20767-CR-KING.  The other two

owners, Marianella Valera and Judith Negron are each serving 35-year sentences.  *See id.*  While

the doctors in this case were not the masterminds, the fraud never could have succeeded – particularly not to this magnitude and scope – without their willing involvement.  The statutory maximum ten years is more than fair.  And the United States is recommending the same 120-month sentence for Dr. Ayala.

The requested sentence is also reasonable in comparison to similar fraud cases.  *See e.g.*, *United States v. De Los Rios*, No. 10-527-CR-LENARD, Docket Entry No. 291 (S.D. Fl. June 29, 2011) (sentencing defendant doctor to 20 years imprisonment for involvement in schemes totaling $42.6 million); *United States v. Mateos*, 623 F.3d 1350, 1368 (11th Cir 2010) (affirming 30-year sentence for physician involved in $11 million health care fraud scheme)

Dr. Ana Alvarez was sentenced by Chief Judge Moreno to 360 months imprisonment for her role as a physician at a fraudulent HIV infusion clinic in *United States v. Alvarez*, 08-20270-CR-MORENO.  In that case, Defendant Ana Alvarez was responsible for conspiring with others to submit thousands of false claims totaling more than $11 million to the Medicare program.  During the course of her criminal conspiracy, Alvarez falsified medical records, performed sham medical examinations, and ordered and authorized hundreds of medically unnecessary procedures.  On appeal, the Eleventh Circuit upheld defendant Alvarez's 360 month sentence in a decision authored by the Honorable Sandra Day O'Connor, Associate Justice of the United States Supreme Court, sitting by designation.  *See United States v. Mateos*, 623 F.3d 1350 (11th Cir. 2010).

Physician Rene De Los Rios was sentenced by Judge Lenard to 20 years in prison for his role in two HIV infusion schemes totaling $46.2 million in intended loss.  *See* No. 10-527-CR-LENARD, Docket Entry No. 291 (S.D. Fl. June 29, 2011).  De Los Rios similarly falsified

19

medical records, performed sham medical examinations, and authorized medically unnecessary procedures.

The ATC scheme was massive even in comparison to the huge Medicare frauds discussed above.  And the intended loss dwarfs those cases.  Dr. Willner falsified medical records, he or his ARNPs (under his direction, as he constantly argues), performed sham medical examinations, and he authorized medically unnecessary procedures, namely tens of millions of dollars worth of PHP treatment.

### (7) The need to provide restitution

The defendant should pay restitution of $51,965,071.24, which represents the gross proceeds from the ATC and ASI frauds, jointly and severally his co-conspirators.

### RECOMMENDATION

The victims of the ATC fraud included more than the Medicare program and the taxpayers.  As became apparent during the trial this scheme used sick, elderly, demented, drug-dependent, homeless, and other vulnerable people as props in a game to bilk as much money as possible out of Medicare.  The ATC "patients" were some of the most vulnerable citizens in our population, and ATC preyed on them, filled their centers with them, and billed Medicare for as much as they could on their behalves.  These sick and dependent people could have received treatment elsewhere – treatment that would have been more appropriate for their diseases – but instead were bought and sold by the very people who were supposed to be protecting their interests, the assisted living facility owners, halfway house owners, and the owners of the Community Mental Health Center – ATC – where they ended up.  They ended up at ATC under the supposed care of doctors like Willner – doctors who were far too well-trained and far too experienced not to notice these people did not have the diseases that should have been treated at

ATC.  In fact, Dr. Willner and the other doctors knew that these patients actively needed treatment – for Alzheimer's disease or substance abuse or otherwise – that they were <u>not</u> getting at ATC.

The exploitation of this vulnerable population was right in front of Willner, every time he went to a facility to sign documents.  But, instead of fulfilling his oath as a physician and helping them, he did his part in exploiting them.  He may not have been the one buying the patients, but he was the one signing off on their "treatment" so that more money would come in from Medicare and the cycle could continue.  And for that small percentage of patients who did have acute onset of a serious mental illness, his conduct toward them is perhaps even more reprehensible.  They did not get PHP treatment, but he signed off on their files as if they had.  He made it impossible for them to get the treatment they needed – treatment he was trained to provide – because he told Medicare they were getting it, even though he had no intention of providing it.

The United States requests the statutory maximum sentence of 120 months for Defendant Willner.  The United States also requests that the Court impose a three year term of supervised release and require the defendant to pay restitution, jointly and severally with his co-defendants and his co-conspirators in 10-20767-CR-KING, of $51,965,071.24.

Respectfully submitted,

WIFREDO FERRER
UNITED STATES ATTORNEY

By:        /s/

Jennifer L. Saulino
Trial Attorney
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
Phone:  202-445-9674
Fax:  202-514-7021
Jennifer.Saulino@usdoj.gov

## CERTIFICATE OF SERVICE

On this 20th day of September, 2012, I hereby certify that I have electronically filed and

served this document using CM-ECF.


                                         _____/s/_____

JENNIFER L. SAULINO
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Ave., NW
Washington, DC  20005
Tel: (202) 445-9674 (mobile)
Jennifer.Saulino@usdoj.gov